# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7302 | **DATE** | 2/6/2002 |
| **CASE TITLE** | Gerlene Griffith vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Plaintiff's motion for summary judgment (No. 17-1) is granted and Defendant's motion for summary judgment is denied. The case is remanded to the ALJ to re-determine Plaintiff's residual functional capacity and determine whether Plaintiff could perform any jobs in the national economy.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | | |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | FEB 07 2002 | | |
| | Notified counsel by telephone. | | date docketed | | |
| | Docketing to mail notices. | | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | 2/6/2002 | | |
| | | | date mailed notice | | |
| ETV | courtroom deputy's initials | | ETV | | |
| | | | mailing deputy initials | | |

CLERK, U.S. DISTRICT COURT

02 FEB -6 PM 4: 42

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GERLENE GRIFFITH                          )
                                          )
          Plaintiff,                      )
                                          )        No. 00 C 7302
                                          )
JO ANNE B. BARNHART,[1] Commissioner,     )            Judge
of the Social Security Administration,    )      Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerlene Griffith is a 51-year-old high school graduate who lives by

herself in Evanston, Illinois, a few blocks from her daughter and grandson. Plaintiff

suffers from a persistent wound on her left hip, arthritis, and depression, all of which

may be caused by systemic lupus erythematosus.[2] On June 18, 1998, Plaintiff applied

for Disability Insurance Benefits and Supplementary Security Income under Titles II

and XVI of the Social Security Act. 42 U.S.C. §§ 416(i), 423, 1381a. On November 21,

2000, Defendant, the Commissioner of the Social Security Administration ("the

Commissioner"), denied her claim. On December 6, 2000, Plaintiff filed this action for

judicial review pursuant to 42 U.S.C. § 405(g).

For the reasons set forth herein, this court agrees with the Administrative Law

Judge ("ALJ")'s November 22, 1999 decision that Plaintiff's disability did not meet the

requisite level of severity for impairment under federal regulations, but concludes that

---

[1]     Pursuant to FED. R. CIV. P. 25(d)(1) and Pub. L. No. 103-296, Jo Anne B.
Barnhart is substituted as the named Defendant for Kenneth S. Apfel.

[2]     "A chronic, relapsing, inflammatory, and often febrile multisystemic
disorder of connective tissue, characterised principally by involvement of the skin,
joints, kidneys, and serosal membranes." The On-line Medical Dictionary, *at*
http://www.graylab.ac.uk/cgi-bin/omd?lupus+erythematosus,+systemic (last modified
December 12, 1998.)

the record is inadequate to support the ALJ's determination that Plaintiff had the residual functional capacity to work. Accordingly, the Commissioner's decision is reversed and the case is remanded to properly determine Plaintiff's residual functional capacity and whether she is able to perform any work in the national economy.

## PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits and Supplementary Security Income on June 18, 1998.[3] (Record ("R.") at 578-580.) Her application was denied on September 4, 1998 (R. at 102-05) and her request for reconsideration was denied on October 30, 1998. (R. at 108-10.) She appealed the decision to an ALJ (R. at 107, 111) who denied her disability benefits on November 22, 1999. (R. at 17.) Plaintiff appealed the ALJ's decision to the Appeals Council of the Office of Hearings and Appeals ("Appeals Council") on January 24, 2000 (R. at 604) and on November 21, 2000 the Appeals Council announced that it would not reverse the ALJ's decision. (R. at 9-14.) The final decision of the Appeals Council is deemed the decision of the Commissioner. (R. at 9.)

## FACTUAL BACKGROUND

The following statement of facts is drawn from testimony, medical records, and other materials in the administrative record.

---

[3] Plaintiff had previously applied for disability insurance benefits in 1995. This application and her subsequent request for reconsideration were denied. (R. at 505-07, 509-12, 522-26.) There is no evidence in the record that she appealed this decision. The record also does not contain a second application for disability insurance benefits, but the court presumes that she re-applied for these benefits because the ALJ denied them in his decision. (R. at 20.)

## A. Plaintiff's Medical Testimony

In 1993 Plaintiff developed a cyst[4] on her left hip after an injection that she received as treatment for dehydration caused an infection. The cyst caused her to walk with a limp, so her physician, Dr. Story, had it excised and drained.[5] (R. at 45-46.) The wound from this procedure did not heal and, in 1995, Dr. Matthew J. Hyser drained her wound again. (R. at 45-46, 50, 380.) In June 1996, Dr. Steven Kafka drained her wound a third time and skin from Plaintiff's thigh was grafted onto her wound. (R. at 45-46, 50-51.) Yet the wound continued to drain and, according to Plaintiff, drains "for about three or four months, and then it would go away, and then it would come back and drain again." (R. at 51.) At the time of the hearing, her wound was draining once again. (*Id.*)

Plaintiff refers to her skin-grafted wound as a "hump." (R. at 72.) Her "hump" makes it hard for her to sit, stand, or bend over. (R. at 53.) For example, after five minutes of sitting, Plaintiff claims she must sit on her right side to be comfortable and after ten minutes of standing, Plaintiff claims she must lift one of her feet to avoid painful swelling. (R. at 60-61.) She claims that the most comfortable position is lying on her stomach or on her left side. (R. at 62.)

Plaintiff also claims she suffers from lupus and believes this is the reason her

---

[4]     "Any closed cavity or sac that is lined by epithelium often contains liquid or semi-solid material." The On-line Medical Dictionary, *at* http://www.graylab.ac.uk/cgi-bin/omd?cyst (last modified October 9, 1997).

[5]     The only evidence in the record relating to the source of Plaintiff's cyst is Plaintiff's testimony. The record also lacks any of Dr. Story's medical records, but there is a mention that he was a consulting physician in 1994. (R. at 340.)

wound will not heal.[6] (R. at 50.) Her lupus causes flare-ups every month, more during the summer. (R. at 54.) During a flare-up, Plaintiff's hands swell for two to three days at a time, she gets a dark rash under her eyes, vomits, has "throbbing pain" like a toothache, is weak, and "ache[s] all over." (R. at 54-55, 59, 63.) She rates her pain during a flare-up as a ten out of ten and a seven out of ten at all other times. (R. at 59.) Anxiety, clothing, and prolonged sitting increase her pain. (R. at 60.) Plaintiff also claims that during lupus flare-ups, her arthritis causes joint pain, particularly in her knees, feet, and hands. (R. at 53, 62.) Finally, she claims her lupus has affected her memory, eyesight, and concentration. (R. at 68.)

Plaintiff also suffers from fatigue and depression. (R. at 64, 68.) She claims her depression began when she was diagnosed with lupus, but she does not state when this diagnosis was made.[7] She states that she "doesn't go out," "doesn't want to be with people," is "cranky" and "angry," feels "intimidated and unfeminine and embarrassed,"

---

[6]    Non-healing wounds are not a common symptom of lupus. The most common symptoms associated with lupus as indicated by the percentage of people with lupus who exhibit the symptom are achy joints (arthralgia) (95%), fever greater than 100 degrees F (38 degrees C) (90%), arthritis (swollen joints) (90%), prolonged or extreme fatigue (81%), skin rashes (74%), anemia (71%), kidney involvement (50%), pain in the chest on deep breathing (pleurisy) (45%), butterfly-shaped rash across the cheeks and nose (42%), sun or light sensitivity (photosensitivity) (30%), hair loss (27%), abnormal blood clotting problems (20%), Raynaud's phenomenon (fingers turning white and/or blue in the cold) (17%), seizures (15%), and mouth or nose ulcers (12%). Symptoms of Lupus, *at* http://www.lupus.org/info/sym.html (last accessed on January 22, 2002).

[7]    Plaintiff believes that she has lupus and the ALJ so found, (R. at 29-30) but the record does not contain medical test results supporting this diagnosis. Even though the record is replete with references to her lupus, this court cannot determine if these references are based on her belief or on a medical determination. (*See* R. at 99, 155, 159, 207, 220, 229, 243, 564.) Blood work in February 1995 was negative for lupus (R. at 330-31) and in June 1996 a medical doctor stated he did not have enough information to make a diagnosis. (R. at 389-90.)

and claims that she is "not happy at all" and has not "been at peace since she was working." (R. at 67, 70.) Plaintiff stated that she takes care of her own personal hygiene except when her arthritis is flaring up; at these times her daughter takes care of Plaintiff's personal hygiene. Plaintiff's daughter and grandson also take care of all the household chores such as cleaning, cooking, paying bills, and grocery shopping. (R. at 70, 75.) Plaintiff takes the anti-depressant medication Paxil to treat her depression; the record does not state who prescribed this medication. (R. at 69.)

## B.   Plaintiff's Medical Record

In addition to the Plaintiff's testimony, the ALJ relied on the following medical records:

### 1.   Dr. M. Lang-Carney, M.D.

On February 14, 1995 Plaintiff was admitted to St. Francis Hospital and treated by her primary care provider, Dr. M. Lang-Carney, M.D. Dr. Lang-Carney's records show that Plaintiff had a fever and complained of pain and the swelling of her hand joints. Dr. Lang-Carney also noted that Plaintiff had lost five pounds in one week. While she was at St. Francis Hospital, the wound on her left hip was drained and her blood tested negative for lupus antibodies. She was discharged on February 22, 1995. (R. at 330-31.) Dr. Lang-Carney's notes from August 30, 1995 indicate that Plaintiff "continues to deal with a large non-healing wound over her right hip"[8] and that "[s]itting aggravates the lesion." (R. at 409.) The doctor's notes also indicated that

---

[8]    Dr. Lang-Carney's medical notes indicate that the wound is on Plaintiff's right hip. This is the only reference to a wound on Plaintiff's right hip and is apparently a mistake. (*See* R. at 409, 410, 411.)

Plaintiff was unable to work because of the wound on her left hip and pain associated with it. (R. at 410.)

### 2. Dr. Matthew J. Hyser, M.D.

On May 19, 1995, Dr. Matthew J Hyser, M.D., a general surgeon, operated on Plaintiff's wound in his Evanston office. (R. at 354-55.) He removed fluid and pus from the wound and placed a Penrose drain[9] in her wound so that it would drain completely without additional surgery. (R. at 354-55.) On May 24, the week after he drained her wound, he stated that "the wound looks good and clean." (R. at 380.) She was discharged with "wet-to-dry dressing." (*Id.*) The record does not state when the Penrose drain was removed. On June 19, 1995, Dr. Hyser saw the Plaintiff again in his office and noted that her "wound is clean and granulating and it is fairly wide open," that she is "getting along with the dressing changes much better," and that the "skin surrounding [the wound] has healed." (R. at 397.) On July 12, he discussed the feasibility of performing a skin graft to address a "large defect that will not close." (R. at 398.) While it is certain that the skin graft was performed in 1996, this court could not determine from the record which doctor performed the operation.

### 3. Dr. Harvey Friedman, M.D.

In June 1995, Dr. Harvey Friedman, M.D. performed a physical exam and noted that he lacked sufficient information to determine whether Plaintiff had active lupus. (R. at 389-90.) The record does not explain why Plaintiff was referred to Dr. Friedman

---

[9]     A Penrose drain is a "cigarette-shaped gauze wick enclosed in rubber dam tissue or rubber tubing for draining wounds." Fast Health, *at* http://www.fasthealth.com/dictionary/c/cigarette_drain.php (last accessed January 22, 2002).

by her primary care physician, Dr. Lang-Carney, nor does it identify Dr. Friedman's medical specialty.

### 4. Dr. Steven Kavka, M.D.

Dr. Steven Kavka, M.D. saw the Plaintiff from October 14, 1995 to September 12, 1996. (R. at 192.) The record does not state how frequently Plaintiff saw Dr. Kavka during this period, who referred Plaintiff to him, or the nature of the treatment he provided. Dr. Kavka completed a respiratory report and psychiatric report for the Bureau of Disability Determination Services in July 1998.[10] In these reports he noted that the Plaintiff "was unable to work because of pain both sitting and standing" and that "[s]he walked awkwardly, bent to the side." He also noted that he did not know her present condition, but that when he last saw her "she was walking normally and gradually easing into her normal activity level." Finally, when describing Plaintiff's mood and affect, Dr. Kavka stated that "[b]ecause of her prolonged course, I think she hadn't fully adjusted to being well again," (R. at 191-93), a statement suggesting that Dr. Kavka believed Plaintiff's wound had healed.

### 5. Dr. Ronnie F. Luyun, M.D.

Dr. Ronnie F. Luyun, M.D. is a doctor at Evanston Township Hospital. The record does not state Dr. Luyun's medical specialty. Dr. Luyun treated the Plaintiff several times between April 14, 1998 and May 11, 1999. (R. at 284-304.) He completed a respiratory and psychiatric report for the Bureau of Disability Determination Services on July 14, 1998. (R. at 206-215.) In these reports, Dr. Luyun noted that

---

[10]  The respiratory report was completed on July 7, 1998. (R. at 189.) The psychiatric report is undated, but presumably was completed at approximately the same time as the respiratory report.

Plaintiff's "hump" affects her daily living activities and causes her to favor her left side. (R. at 209.) He also noted that her arthralgia[11] was especially worse when her lupus flares up, that she was concerned about her long-term prognosis, that she had no evident abnormality in her speech and mental capacity, and that she can manage her own funds. (R. at 208, 209, 211.) He diagnosed her with systemic lupus erythematosus ("SLE"), but it is not known if he made this diagnosis independently or if it was based on Plaintiff's assertions.[12] (R. at 211.) He found that the prescribed medications – ibuprofen, plaquenil,[13] and prednisone[14] – had reduced the wound's drainage. He was unable to assess her ability to do work-related activities. (R. at 211.) Additionally, on August 25, 1998 he noted that Plaintiff did not want to see a psychiatrist even though she was depressed. (R. at 297.)

6. **Consulting Physicians**

In August 1998, Plaintiff saw several additional physicians, apparently in connection with this claim for benefits. Except where noted, the record does not reveal the medical specialties of these doctors, each of whom Plaintiff saw only once.

---

[11]    "Pain in a joint." The On-line Medical Dictionary, *at* http://www.graylab.ac.uk/cgi-bin/omd?arthralgia (last modified November 18, 1997).

[12]    Dr. Luyun's notes explicitly state that he was "[n]ot able to review prior records complete" [sic].

[13]    Plaquenil is a drug commonly used to treat both lupus and rheumatoid arthritis. HealthSquare.com *at* http://www.healthsquare.com/newrx/PLA1337.HTM (last accessed January 22, 2002).

[14]    Prednisone is used to suppress inflammation and prescribed for both lupus and arthritis. FocusonArthritis.com *at* http://www.focusonarthritis.com/script/main/art.asp?articlekey=809  (last accessed January 22, 2002).

### a.    Dr. Rama Embar, M.D.

On August 10, 1998, Dr. Rama Embar, M.D. conducted a psychiatric evaluation of Plaintiff at the Lake Shore Medical Clinic. Dr. Embar diagnosed a depressive disorder. In summarizing Plaintiff's illness, Dr. Embar pointed to a "history of lupus erythematosus," a "history of depression," and "the fact that she is not able to work or do her daily activities." (R. at 217-19.) In making the diagnosis, Dr. Embar noted that Plaintiff's "posture and gait were normal"; her psychomotor activity was normal; "she was pleasant and cooperative"; she "complained of pain in various parts of her body"; her "speech was normal in rate and rhythm"; her mood was "depressed"; her affect was "sad, appropriate"; she had "no paucity of thought, flight of ideas, loose associations, circumstantiality or tangentiality"; there was "no evidence of thought disorder"; she was "alert and oriented to time, place and person"; "able to recall four digits forwards and four backwards"; "able to recall two out of three objects"; knew that Clinton was the President, thought Reagan was his predecessor, and knew that Richard Daley was the Mayor of Chicago; able to do serial 3's; and was capable of abstraction, recognized distinctions, and exercised judgment. (R. at 217-19.)

### b.    Dr. George Bridgeforth, M.D.

On August 10, 1998, Dr. George Bridgeforth, M.D. performed an internal medicine evaluation of Plaintiff at Lake Shore Medical Clinic.[15] His clinical impressions were that Plaintiff had systemic lupus erythematosus, a left hip abscess,[16]

---

[15]    The court assumes that the purpose of these visits, both on August 10, 1998, was to support the disability claim which Plaintiff filed two months earlier.

[16]    "A localised collection of pus caused by suppuration buried in tissues,
(continued...)

and depression. (R. at 222.) He also noted that her cooperation, comprehension, and effort were "good." (R. at 227.)

### c.    Dr. Carl Hermsmeyer, Ph.D.

Dr. Carl Hermsmeyer, Ph.D. assessed Plaintiff's Functional Capacity on August 25, 1998. (R. at 230.) He determined that Plaintiff's ability to understand and remember detailed instructions and her ability to carry out detailed instructions were moderately limited, but that her remaining mental capabilities were not significantly limited. (R. at 230-31.) He noted that she suffered a slight restriction in her daily living activities and slight difficulties in maintaining social functioning, but seldom had deficiencies of concentration and persistence of pace resulting in failure to complete tasks in a timely manner. (R. at 241.) He diagnosed a depressive disorder and indicated that she has the mental capacity to perform simple tasks. (R. at 232, 237.)

### d.    Dr. Greg Gerenberg, M.D.

On September 24, 1998, Dr. Greg Gerenberg, M.D. assessed Plaintiff's psychiatric and medical condition. He diagnosed lupus and arthritis, but once again it is not known if he made the lupus diagnosis independently or if it was based on Plaintiff's assertions. He also stated that the Plaintiff would not be capable of full-time employment for a year or more since she "cannot be on [her] feet for a long time [and] cannot sit for long periods." (R. at 229.)

---

(...continued)
organs or confined spaces. Usually due to an infective process." The On-line Medical Dictionary, *at* http://www.graylab.ac.uk/cgi-bin/omd?abscess (last modified November 18, 1997).

### e.    Dr. B. Drevlow, M.D.

Dr. B. Drevlow, M.D. saw the Plaintiff twice: once in August 1998, and a second time on January 12, 1999.  On January 12, 1999, Dr. Drevlow stated that he had previously diagnosed Plaintiff with systemic lupus erythematosus and a skin lesion. (R. at 262.) Again, the court can not determine whether Dr. Drevlow's lupus diagnosis was made independently or was based on Plaintiff's self-report. Dr. Drevlow noted that as a result of the pressure on her thigh wound, Plaintiff could neither sit nor stand continuously for six out of eight hours. (R. at 263.)  Dr. Drevlow noted that Plaintiff had difficulty bending and squatting, and stated that her credibility was "good," and her pain "real." (R. at 264.)

### f.    Dr. Earl W. Donelon, M.D.

On August 27, 1998, Dr. Earl W. Donelon, M.D. assessed Plaintiff's Residual Functional Capacity.  (R. at 243.)  He noted that Plaintiff could stand for a total of about six hours in an eight-hour workday, and sit for about six hours in an eight-hour work day. (R. at 244.)  He noted that she occasionally had postural limitations in climbing, balancing, stooping, kneeling, crouching, and crawling, but had no manipulative, visual, communicative, or environmental limitations.  (R. at 245.)

### 7.    Virginia Zarifi, M.A.

Virginia Zarifi counseled the Plaintiff from December 1998 until April 2000.[17] Ms. Zarifi claims to have met with the plaintiff nine times at St. Francis Hospital

---

[17]    Ms. Zarifi worked at the Mental Health Center of St. Francis Hospital between December 1998 and June 1999 before leaving to work for United Stand Family Counseling Center, where she continued to counsel Plaintiff until April 2000.

between December 1998 and June 1999.[18] (R. at 615.) Ms. Zarifi's progress notes contain twenty-four entries for these seven months. (R. at 309-320.) Twenty-three of them identify scheduled appointments. Plaintiff cancelled thirteen appointments, failed to show up for three others, and attended seven appointments. In notes summarizing Plaintiff's appointments and phone calls cancelling appointments, Ms. Zarifi noted that Plaintiff was depressed on thirteen occasions; suffered from fear, helplessness, or anger nine times; experienced pain ten times; and was fatigued eight times. (R. at 309-20.) Additionally, on March 30, 1999, she noted that the Plaintiff was away in Michigan to visit her son. (R. at 313.)

In addition to her progress notes, Ms. Zarifi twice diagnosed the Plaintiff with a major depressive disorder, first on December 4, 1998 and a second time on February 3, 1999. (R. at 321, 324, 271.) In her first diagnosis, she noted that Plaintiff's affect was constricted; she was angry, depressed, and ashamed; she was hypoactive; had an organized thought process; had intact attention; fair insight; fair judgment; average intelligence; intact short-term and long-term memory; impaired recent memory; impaired sleep; impaired appetite; normal hygiene; no violence risk; and minimal suicide risk. (R. at 323-24.) In her second diagnosis, Ms. Zarifi stated that the Plaintiff's "mental and physical condition make [her] capacity to maintain sustained work-related activity markedly limited." (R. at 271.) She observed that Plaintiff had responded well to treatment, which included psychotherapy, a support group, and the anti-depression medication Paxil. (R. at 272.) She concluded that

------

[18]    Ms. Zarifi's progress notes reflect only seven meetings with the Plaintiff. (R. 309-320.)

Plaintiff was nevertheless "unable to maintain focus and concentration for an extended period of time as a result, making it difficult to retain information or carry out instructions" and that her "ability to maintain these activities and functions over a normal workday, and on an ongoing basis is significantly limited." (R. at 276.) All of the documents she completed while at St. Francis Hospital were signed by her supervisor, Dr. Scott Ambers, M.D. (R. at 309-326, 266-273.)

After Ms. Zarifi began working for United Stand Family Counseling Center, she counseled Plaintiff at her home on sixteen additional occasions. (R. at 615, 617-625.) In her final May 2000 summary of Plaintiff's counseling sessions, Ms. Zarifi noted that the Plaintiff "continues to suffer from Major Depressive Disorder and Panic Disorder, both of which, with her medical condition, significantly impair her ability to function outside her home and to sustain any type of employment." (R. at 616.)

## C.     Plaintiff's Employment History

From 1984 to 1995, Plaintiff worked at School District 202 in Evanston Township, first as an attendance officer for four years and then as a registrar secretary. (R. at 47, 53.) Her job required computer skills as well as some light lifting. It also required her to spend roughly two-thirds of her time sitting and the rest standing. (R. at 46-48.) On an unspecified date in April 1995, the Plaintiff stopped working because of her medical problems. (R. at 50, 72.) She was first prevented from working by arthritis and later, after her skin graft surgery, by her hip wound. (R. at 72.)

### 1.     Testimony of Plaintiff's Case Worker

Rosemary Jean-Paul is a case coordinator at the Evanston Township General

Assistance Office ("GAO"). (R. at 76.) She has a bachelor's degree in criminal social justice. (R. at 77, 82.) Between March 1998 and April 1999 when she testified at the administrative hearing, Ms. Jean-Paul saw the Plaintiff in her office two to three times a month for somewhere between 10 and 30 minutes and spoke to her on the phone twice a month. The purpose of these meetings was to help Plaintiff find work. (R. at 78.) Ms. Jean-Paul noted that Plaintiff has "trouble concentrating" and "doesn't focus" during their thirty-minute meetings. (*Id.*) She also noted Plaintiff's loss of energy, loss of weight, dark circles under her eyes, medical problems, and social isolation, as well as Plaintiff's daughter's concern for Plaintiff's health. (R. 79-80.)

In March and April of 1998, Plaintiff unsuccessfully participated in a GAO work program designed to match participants with interviewing employers. (R. at 78, 82-83.) She stopped participating in the program after Ms. Jean-Paul determined that she was not physically or mentally capable of participation and that she was unable to perform any of the available receptionist, data-entry, or labor jobs. (R. at 79, 82.) Ms. Jean-Paul also testified that she believed Plaintiff was depressed and referred her to the adult guidance center at St. Francis Hospital. (R. at 79-80.)

## 2. Testimony of Vocational Expert

Susan Entenberg is a vocational expert with the Social Security Administration and is a licensed clinical professional counselor in Illinois. (R. at 84, 128.) She stated that she had reviewed the case file and heard the Plaintiff's testimony regarding her work history. (R. at 85.) The ALJ presented Ms. Entenberg with the following hypothetical:

If we were to assume . . . a hypothetical female individual who's 48 years old, has a high school education, having the ability to read, write, and numbers, also having the same prior work history as the claimant, having had the capacity to perform work with the following, no other additional limitations. The individual would have the capacity to lift and carry up to a maximum of 10 pounds on an occasional basis, and lighter items such as small hand tools or individual case files on a frequent basis, with the capacity to sit with normal breaks for up to six hours each within an eight hour day, the individual has the capacity to stand and walk again with normal breaks for a combined total of let's say two hours within the eight hour day. An individual may not climb ladders, ropes or scaffolds, may otherwise climb ramps or stairs no more than occasionally, and may also occasionally perform other activities such as balancing, stooping, kneeling, crouching, crawling. The individual must avoid concentrated exposure to fumes, odors, dust, gases and pulmonary irritants, and by reason of a depressive condition does not have the capacity to understand, recall, carry out complex or detailed instructions or to perform complex or detailed tasks, but does retain the capacity to understand, recall and carry out simple tasks and simple instructions on a sustained basis.

(R. at 86-87). Ms. Entenberg testified that the hypothetical individual described by the ALJ could not perform the Plaintiff's prior work – which is classified as a sedentary semi-skilled job – due to an inability to perform detailed, complex tasks, but would retain the ability to perform the full range of sedentary, unskilled work. (R. at 86-88.)

After the ALJ modified the hypothetical to include an additional limitation – that the individual must be allowed to alternate from the seated to the standing position at intervals of 45 minutes for a period of 5 to 10 minutes on each occasion – the vocational expert stated that the individual could perform sedentary work that has a sit/stand option. She testified that there are 3,000 assembly jobs, 2,000 packing jobs, and 1,000 inspection jobs within that category in the Chicago metropolitan area. (R. at 87-89.) She also testified, however, that maintaining a position for 30 minutes is the "bare minimum" in order to "maintain production" and if the individual had to change position every 30 minutes, she would not have enough time to finish a task and

maintain a competitive rate. (R. at 88-90, 92-93.)

Ms. Entenberg also addressed Dr. Drevlow's assessment that Plaintiff could not sit or stand continuously for six out of eight hours. (R. at 263.) Ms. Entenberg stated that under one interpretation of this assessment – that Plaintiff could not sit or stand for six consecutive hours within an eight hour period – Plaintiff would be able to perform the jobs noted above. (R. at 95-96.) Ms. Entenberg echoed the ALJ in noting that Dr. Drevlow's assessment could be understood in other ways, however. (R. at 95.) She called the assessment a "confusing statement." (R. at 96.)

**D.   The ALJ's Decision**

**1.   The Five-Step Test**

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations prescribe the following five-step test to determine whether an individual is disabled:

(1)   Is the claimant presently employed?

(2)   Is the claimant "severely" impaired? Do the claimant's physical or mental impairment(s) "significantly limit [claimant's] ability to do basic work activities?"

(3)   Does the claimant's impairment(s) meet the level of severity identified in 20 C.F.R. § 404 , Appendix 1?[19]

---

[19]   Appendix 1 to Subpart P of 20 C.F.R. §404 provides a list of all the medical conditions that may constitute a disability under the Social Security Act. It also describes how these medical conditions need to be documented in order to be "severe" enough to constitute a "disability." Both lupus and depression are listed in

(continued...)

(4)     Can the claimant perform his or her past relevant work?
(5)     Can the claimant perform any other work in the national economy in light of her age, education, and work experience?  20 C.F.R. § 404.1520, 416.920

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  A claimant will be found to have a "disability" under the Social Security Act upon making the requisite showing that the claimant's impairment meets the requisite level of severity at step (3) or upon determining that the claimant cannot perform any other work in the national economy at step (5).

## 2.     The **ALJ's Findings and Reasoning**

The ALJ applied the five-step test and found that the Plaintiff was not under a "disability" at any time through the date of his decision. Thus, he denied her claim of disability, and her request for disability insurance benefits and supplemental security income. (R. at 31.) The ALJ determined that (1) Plaintiff was not employed during the period for which she is claiming a "disability" and (2) Plaintiff had a "severe" impairment. At step (3), however, he determined that her impairments did not meet the requisite level of severity.  He stated that "the claimant's lupus/skin lesion impairment is not associated with findings of resistance to treatment as required under section 14.02[20] when evaluated under the criteria of section 8.00,"[21] that there is no

---

(...continued)
Appendix 1.

[20]     Section 14.02(A) states that lupus must be documented with one of the following: joint, muscle, ocular, respiratory, cardiovascular, digestive, renal, skin, neurological involvement, or mental involvement. Section 14.02(B) states that lupus can be documented by the "lesser involvement of two or more organs/body systems listed in paragraph A, with significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss. At least one of the organs/body

(continued...)

"evidence of significant limitation of motion of the claimant's left hip when evaluated under section 1.00,"[22] and that the requisite level of severity is not met even when "considering the combination of the claimant's impairments." (R. at 21-22 (footnotes not in original).)

The ALJ discussed all the relevant medical evidence and concluded that Plaintiff's allegations of disabling impairments were not supported by the objective medical record. (R. at 23.) Regarding Plaintiff's hip wound, he determined that "the evidence shows that [although] at times the claimant's lesion has leakage/drainage, various treatment notes show that the claimant's left hip skin lesion was dry and was healing well." (R. at 24.) He observed that "[o]verall, the evidence does show that the claimant's condition is attended by flares of tenderness, and reduced range of motion, but it has also been described as well controlled." (R. at 25.) Regarding Plaintiff's arthritis, he noted evidence that supported her allegations of arthritis, but also found evidence in the record indicating no "deficiency of manipulation," "no evident abnormality of grip," and "normal range of motion" in the majority of Plaintiff's joints. (R. at 24.) Regarding Plaintiff's depression, the ALJ determined that the Plaintiff had a depressive disorder which moderately restricted her daily living activities, caused slight difficulties in maintaining social function, and often caused deficiencies of

_____

(...continued)
systems must be involved to at least a moderate level of severity." 20 C.F.R. § 404 App. 1.

[21]       Section 8.00 states that "[s]kin lesions may result in a marked, long-lasting impairment if they involve extensive body areas or critical areas such as the hands or feet and become resistant to treatment." 20 C.F.R. § 404 App. 1.

[22]       Section 1.00 states that joint involvement can qualify as an impairment if, inter alia, there is "significant restriction of function of the affected joints." 20 C.F.R. § 404 App. 1.

18

concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (R. at 33-34.)

The ALJ also determined that Plaintiff's allegations were not consistent with the objective medical record. He considered the factors discussed in 20 C.F.R §§ 404.1529(c)(3) and 416.929(c)(3)[23] as well as Social Security Ruling 96-7p[24] in determining whether Plaintiff's allegations should be accepted in light of the inconsistent medical evidence. (R. at 26.) The ALJ determined that Plaintiff's allegations should not be accepted and listed the following seven reasons in support of his decision:

1. The fact that Plaintiff received only "routine and conservative" care for what were purportedly disabling conditions. (R. at 26.)
2. Dr. Gerenberg's and Ms. Zarifi's opinions that Plaintiff can not work were not supported by objective treatment record findings.[25]

---

[23] Both regulatory sections incorporate the same factors, which are "(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

[24] Under Social Security Ruling 96-7p, the ALJ's decision regarding claimant credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

[25] Dr. Gerenberg completed only a one page form that set forth no objective findings. (R. at 229.) The ALJ determined that Ms. Zarifi's opinion that the Plaintiff can not work was not fully persuasive because it was "not clearly or fully supported by

(continued...)

19

(R. at 27.)

3.  Medical evidence shows that medications, particularly Prednisone, Plaquenil, and Paxil, have been effective at controlling Plaintiff's symptoms. (R. at 27.)

4.  On one occasion, Plaintiff expressed an unwillingness to see a psychiatrist while complaining of depression. (R. at 27.)

5.  Plaintiff's alleged limited daily activities cannot be "objectively verified" or attributed to Plaintiff's medical condition. (R. at 27.)

6.  Ms. Jean-Paul's opinion that Plaintiff cannot work is not "deemed persuasive" since she is a case worker – a non-medical source. (R. at 27.)

7.  The medical record contained several findings that the Plaintiff was not disabled. (R. at 28.)

Finally, he determined the Plaintiff's residual functional capacity in order to complete steps (4) and (5). He determined that the Plaintiff's impairments

> preclude only the following work-related activities: lifting/carrying up to 10 pounds more than occasionally or lighter items such as small hand tools or individual case files more than frequently; standing and/or walking (using a cane for ambulation) for more than brief periods of 10-15 minutes on each occasion and for more than a combined total of 2 hours in an 8 hour day; sitting with normal breaks, for more than a total of 6 hours in an 8 hour workday, but must be allowed to alternate between sitting and standing at intervals of 45 minutes for a period of 5 to 10 minutes on each such occasion; climbing ropes, scaffolds, and ladders; climbing ramps and stairs more than occasionally; performing activities such as balancing, stooping, kneeling, crouching, and crawling more than occasionally; working in settings containing any respiratory irritant at concentrated levels; understanding, remembering, and/or carrying out detailed and complex work instructions and/or tasks; and performing tasks requiring independent setting of work goals or planning of daily work activities.

(R. at 22.) The ALJ determined that given Plaintiff's residual functional capacity, she could not perform any past relevant work (R. at 28) yet she could perform the

---

(...continued)

the noted records of counseling." (R. at 26.) He noted the findings made on February 3, 1999 were not consistent with the initial assessment made on December 4, 1998, especially given the frequency with which Plaintiff missed appointments, the fact that Plaintiff was able to visit her son in Michigan, and the noted observation that Plaintiff was responding well to medication. (R. at 25-26.)

sedentary unskilled jobs of assembler, inspector, or packager, with respectively 3,000, 1,000, and 200 [sic] jobs available in the 6 county Chicago regional economy.[26] (R. at 29, 31.) Thus, he determined that Plaintiff was never under a "disability" as defined by the Social Security Act.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g); *Dixon*, 270 F.3d at 1176. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). When the medical evidence is inconsistent, the ALJ must "weigh all of the evidence and . . . decide whether [the claimant is] disabled." 20 C.F.R. § 404.1527(c)(2). *See Knight v. Chater*, 55 F.3d 309, 313-14 (7th Cir. 1995) (ALJ properly discounted medical opinions which lacked adequate clinical support). This court "does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [the court's] own judgment for that of the commissioner." *Clifford*, 227 F.3d at 869. Furthermore, this court affords the ALJ's determination of credibility "special deference" and will only reverse this finding if the Plaintiff can show that it is "patently wrong." *Powers v.*

---

[26]    The ALJ's decision stated that there were only 200 packaging jobs available to the Claimant, (R. at 29, 31) but this summary appears to accidentally contradict the vocation expert's testimony that there were 2,000 such jobs. (R. at 89.)

*Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ's findings and conclusions are not, however, entitled to unlimited judicial deference. This court may not uncritically "rubber stamp" the ALJ's decision. *Clifford*, 227 F.3d at 869. Thus, the Seventh Circuit has noted the court's obligation to critically review the record to ensure that the ALJ did not "play doctor" by making "independent medical findings." *Rohan v. Charter*, 98 F.3d 966, 970 (7th Cir. 1996). Similarly, the court must also critically review the ALJ's decision to ensure that the ALJ "articulate[d] some legitimate reason for his decision" and built an "accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.

## ANALYSIS

Plaintiff argues that the ALJ's decision that her impairments do not constitute a "disability" should be vacated because it was not based on substantial evidence. (Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Plaintiff's Memo"), at 11-16.) The specific findings that the Plaintiff alleges are not supported by substantial evidence are that the Plaintiff's impairments do not meet the requisite level of severity at step (3) and that the Plaintiff could perform approximately 6,000 jobs in the six-county Chicago regional economy at step (5). (Plaintiff's Memo, at 11.) The court considers the Plaintiff's arguments in turn.

### 1. The Severity of Plaintiff's Impairments at Step (3)

Plaintiff argues that the ALJ lacked a "rational basis" for his decision, "mischaracterized the medical evidence," gave insufficient weight to the opinion of Plaintiff's treating counselor, and failed to properly consider Plaintiff's symptoms of pain and fatigue and her use of medication. (Plaintiff's Memo at 11, 12, 13, 17, 18.)

Although the court recognizes that the record might support a different conclusion, Plaintiff's arguments do not establish that the ALJ's decision was not based on substantial evidence.

Step (3) requires the ALJ to determine whether Plaintiff's impairments meet the requisite level of severity as defined by the Social Security Act. 20 C.F.R. § 404, Subpt. P, App. 1. In order for Plaintiff's condition to be considered sufficiently severe to establish a "disability" under section 14.02, either (a) her hip wound have to satisfy section 8.00, (b) her arthritis would have to satisfy section 1.00, (c) her depression would have to satisfy section 12.00, or (d) a combination of two or more of these impairments would have to satisfy section 14.02B. *Id.* The ALJ determined that test was not met, and the court finds no basis to disturb that determination.

First, with respect to Plaintiff's hip wound, section 8.00 requires that the wound be "resistant to treatment." 20 C.F.R. § 404, Subpt. P, App. 1. The ALJ's finding that Plaintiff's hip wound was not "resistant to treatment" was based on substantial evidence in the record indicating that Plaintiff's hip wound was "healing well" and "well controlled." (R. at 24-25, 210, 290.) While there is evidence in the record that supports the opposite conclusion, it is the ALJ's job to weigh the evidence, not that of this court.

Further, with respect to Plaintiff's arthritis, section 1.00 requires that it cause "significant limitation of motion." 20 C.F.R. § 404 App. 1. The ALJ's finding that Plaintiff's arthritis did not cause "significant limitation of motion" was based on substantial evidence in the record indicating that Plaintiff's arthritis had caused no "deficiency of manipulation," and "no evident abnormality of grip." (R. at 24, 222, 212,

287-290.) Again, while there is evidence that supports the opposite conclusion, the court defers to the ALJ's assessment of the evidence.

With respect to Plaintiff's depression, section 12.00 requires the ALJ to follow the procedures outlined in 20 C.F.R. § 404.1520a. The ALJ's psychiatric evaluation summarized specific findings supporting his determination that Plaintiff's depressive disorder does not meet the requisite level of severity. (R. at 32-34.) These findings are supported by substantial evidence because they rest on evidence in the record that Plaintiff had "no evident abnormality with her speech and mental capacity" and that she had the "mental capacity to perform simple tasks." (R. at 210, 232.)

Plaintiff alleges that the ALJ's findings concerning Plaintiff's depression were not based on substantial evidence because he "mischaracterized" Dr. Embar's medical evidence, and gave insufficient weight to Ms. Zarifi's opinion. The ALJ did reject Dr. Embar's conclusion that the Plaintiff could not work, but he never disputed Dr. Embar's conclusion that Plaintiff had a depressive disorder. (R. at 32.) The heart of the issue is the severity of her depression, and particularly whether it prevents her from working. Because Dr. Embar and Dr. Hermsmeyer reached contradictory conclusions in the exact same month, August 1998, about Plaintiff's ability to work, the ALJ was justified in looking beyond their conclusions to determine whether her depressive disorder precluded her from working. Using Dr. Embar's objective findings as well as other evidence in the record to resolve inconsistencies does not constitute mischaracterization as alleged by the Plaintiff. Furthermore, where the record contains medical opinions that the Plaintiff's depression does not prevent her from working, the ALJ did not "play doctor" by making "independent medical findings." *Rohan v.*

*Charter*, 98 F.3d 966, 970 (7th Cir. 1996).

Much of this reasoning applies to Plaintiff's additional allegation that the ALJ gave Ms. Zarifi's opinion insufficient weight. The ALJ noted that Ms. Zarifi's psychological assessments reported inconsistent symptoms and suggested that claimant had responded well to medication and treatment, although she needed to continue with therapy. The ALJ also noted that Dr. Embar's report on August 10, 1998 indicated that Plaintiff displayed no thought abnormality. The ALJ noted further that in Plaintiff's original psychological assessment, Ms. Zarifi concluded that Plaintiff suffered from neither short- nor long-term memory impairments. In light of inconsistencies between Ms. Zarifi's own varying assessments, and between the conclusions drawn by Ms. Zarifi and those drawn by other medical professionals, this court is not inclined to reweigh the evidence or disturb the ALJ's conclusion.

Finally, the ALJ considered whether Plaintiff's lupus met the requisite level of severity through the combination of her impairments under section 14.02B. (R. at 22.) To make such a showing under this section, Plaintiff must present evidence of:

> The lesser involvement of two or more of the following organs/body systems: joint, muscle, ocular, respiratory, cardiovascular, digestive, renal, skin, neurological involvement, or mental involvement;
> Significant, documented, constitutional symptoms and signs of severe fatigue, fever, malaise, and weight loss; and
> At least one of the organs/body systems must be involved to at least a moderate level of severity.

20 C.F.R. § 404, Subpt. P, App. 1. Given the inconsistencies in the medical record noted above regarding the severity of Plaintiff's impairments, a finding that none of them reaches "a moderate level of severity" would be supported by substantial evidence. Furthermore, the medical record does not contain "significant, documented,

constitutional symptoms and signs" of fever or weight loss. These symptoms are only noted on one occasion in February 1995 and on another occasion by Plaintiff's case worker. (R. at 330, 79.) Thus, the ALJ's finding that the aggregate effect of her impairments does not meet the requisite level of severity is also supported by substantial evidence.

Because the objective medical record contained evidence that both supported and contradicted Plaintiff's allegations, the ALJ, relying on 20 C.F.R. § 404.1529(c), presented seven reasons why he determined that the Plaintiff's allegations were not consistent with the objective medical record. Plaintiff argues that the ALJ's decision was nevertheless not based on substantial evidence because he did not properly consider Plaintiff's allegations of pain and fatigue as well as the effect of her medications on her symptoms. (Plaintiff's Memo, at 17, 18.) When the ALJ explains the reasons behind his decision logically and accurately, he is not required to address every piece of evidence in the record. *Clifford*, 227 F.3d at 872. Thus, Plaintiff's arguments regarding her pain and fatigue are unpersuasive. Nor is the court moved by Plaintiff's suggestion that one of the ALJ's seven reasons is flawed – specifically, that the objective medical evidence does not show that Plaintiff's medications were effective at controlling her symptoms. The fact that one of the seven factors identified by the ALJ may not withstand scrutiny does not convince the court that the ALJ's findings are not supported.

## 2.     Plaintiff's Employability at step (5)

Plaintiff also challenges the ALJ's step (5) finding that the Plaintiff can perform 6,000 jobs in the national economy. Griffith contends this finding is not supported by

substantial evidence in light of a discrepancy between the ALJ's objective medical findings and the hypothetical question he posed to Ms. Entenberg, the vocational expert. (Plaintiff's Memo, at 15-16.) The ALJ found that Plaintiff's depressive disorder often caused deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. (R. at 34.) His hypothetical question to the vocational expert included a reference to an arguably less-severe condition, however. The only mental limitation included in the hypothetical question was "by reason of a depressive condition [a worker like Plaintiff] does not have the capacity to understand, recall, carry out complex or detailed instructions or to perform complex or detailed tasks, but does retain the capacity to understand, recall and carry out simple tasks and simple instructions on a sustained basis." (R. at 87.)

In the court's view, the omission may be significant. The vocational expert's testimony focused on Plaintiff's ability to "maintain production." She determined that the Plaintiff could "maintain production" if she could alternate sitting for forty-five minutes and standing for five minutes, but not if she could sit for only thirty minutes before having to stand. (R. at 92-93.) Omitting any reference to Plaintiff's difficulties of concentration might well have affected the vocational expert's conclusion, given her testimony that forty-five minutes was adequate to enable Plaintiff to work but thirty minutes was not. Defendant urges that the ALJ effectively mentioned the omitted limitation by noting that Plaintiff is limited to "unskilled" work as defined by 20 C.F.R. §404.1568(a). (Defendant's Memorandum in Support of Summary Judgment, at 14-15.) The court is not satisfied. While unskilled work does not require judgment, it does require an ability to complete projects in a timely manner. Furthermore, even if the

ALJ did include the omitted limitation, it is clear that his decision at step (5) was based primarily on Ms. Entenberg's testimony, which, for reasons given below, does not constitute substantial evidence.

The hypothetical question to a vocational expert must set forth limitations that are supported by objective medical evidence. The fact that a hypothetical question does not set forth every such limitation does not mandate reversal in every case. *See Ragsdale v. Shalala*, 53 F.3d 816, 820 (7th Cir. 1995); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Ehrhart v. Secretary of HHS*, 969 F.2d 534, 540 (7th Cir. 1992). Thus, the Seventh Circuit has upheld findings based on incomplete ALJ hypotheticals where (a) plaintiff's attorney subsequently posed additional hypothetical questions that included the omitted impairment, *Herron*, 19 F.3d at 337; (b) the ALJ's hypothetical reflected the plaintiff's impairments to the extent the ALJ found them supported by the record, *Ehrhart*, 969 F.2d at 540; or (c) the vocational expert had reviewed the record prior to the hearing and been present during the plaintiff's testimony, *Ragsdale*, 53 F.3d at 820.

In the case at hand, Plaintiff's attorney did not pose additional hypotheticals addressing the omitted impairment, and, as noted above, the ALJ's hypothetical does not appear to have fully reflected his conclusions about Plaintiff's mental impairments. While the vocational expert did review the record prior to the hearing and attend Plaintiff's testimony, the court concludes that the case must still be remanded for a determination of the effect of Plaintiff's mental condition, as determined by the ALJ, on her ability to maintain production. Ultimately, the expert's testimony in this case is not probative of which jobs Plaintiff could perform because the omission from the

hypothetical question could have affected her testimony. *See Balenton v. Halter*, 156 F. Supp. 2d 776, 784-85 (N.D. Ill. 2001) (remanding case notwithstanding vocational expert's pre-hearing review of record and presence during plaintiff's testimony where omitted limitation could have affected the vocational expert's testimony).

The court notes, further, an important ambiguity in the medical record reviewed by the ALJ and the vocational expert, also significant enough to warrant remand. *See Brooks v. Chater*, No. 95 C 1154, 1996 WL 11103, at *2 (N.D. Ill. Jan. 8, 1996) (remanding ALJ Social Security decision where crucial term in medical report was ambiguous). Dr. Drevlow's medical assessment stated that Plaintiff could neither "continuously stand for at least 6 of 8 hours" nor "continuously sit upright for at least 6 of 8 hours." (R. at 263.) On one understanding of these phrases, they are irrelevant to Plaintiff's employability: sitting or standing for six *consecutive* hours is unnecessary for the 6,000 jobs that Ms. Entenberg said Plaintiff could perform in the Chicago metropolitan area. The phrases are also susceptible to a second interpretation, however, which would directly influence Plaintiff's employability. If Dr. Drevlow's assessments mean that Plaintiff can not regularly either sit or stand for a *total* of six hours out of a given eight-hour interval, then Plaintiff would not be able to alternate sitting for forty-five minutes with standing for five minutes throughout an eight-hour work day. This pattern of alternation would result in more than six hours of sitting per work day. Although Ms. Entenberg called Dr. Drevlow's summary "a confusing statement" and the ALJ specifically noted the ambiguity of this part of the record during the hearing (R. at 96), his finding ultimately fails to adequately acknowledge the second possible interpretation of Dr. Drevlow's entries. During the hearing, the

ALJ told Plaintiff's counsel that "[i]f you want [Dr. Drevlow] to clarify, we can do that, too, because we'll be looking for some records," but no such clarification appears in the record before this court. (R. at 96.)

## CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment (No. 17-1) is granted and Defendant's motion for summary judgment is denied. The case is remanded to the ALJ to re-determine Plaintiff's residual functional capacity and determine whether Plaintiff could perform any jobs in the national economy.

ENTER:

Dated: February 6, 2002

REBECCA R. PALLMEYER
United States District Judge